[Cite as *Hanley v. Hanley*, 2026-Ohio-2504.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Shannon M. Hanley, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 25AP-290 |
| v. | : | (C.P.C. No. 19DR-4365) |
| Jonathan C. Hanley, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on June 30, 2026

**On brief:** *Kuhn Limited*, and *Ryan D. Kuhn*, for appellee.
**Argued:** *Ryan D. Kuhn*.

**On brief:** *Eugene R. Butler*, for appellant. **Argued:**
*Eugene R. Butler*.

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations

BEATTY BLUNT, J.

{¶ 1} Defendant-appellant, Jonathan C. Hanley, appeals the March 25, 2025 judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations in this post-decree matter, which overruled his first, second, fourth, fifth, and sixth objections to the magistrate's August 13, 2024 decision modifying the parties' shared parenting plan, designating plaintiff-appellee, Shannon M. Hanley, as the school placement parent and modifying appellant's allocated parenting time.

{¶ 2} The primary question in this appeal is whether the trial court erred in permitting modification of the shared parenting plan to allow Shannon to move from New Albany to the Dayton area while remaining the school placement parent under the plan. Jonathan also challenges the court's failure to include his travel expenses in the child support order.

{¶ 3}   Jonathan and Shannon are the parents of minor children C.H. (d.o.b.: 6/27/16) and R.H. (d.o.b.: 12/21/18).  On April 21, 2021, Jonathan and Shannon filed an Agreed Shared Parenting Plan ("Plan") and a decree that incorporated the Plan as an order of the court.  The Plan designated Shannon as the residential parent for school placement purposes.  It also gave Jonathan parenting time through a phase-in process, culminating in him having parenting time for 6 out of 14 overnight periods every 2 weeks.  (Plan at 10.)

{¶ 4}   Jonathan has worked for the United States Drug Enforcement Agency since 2012.  Prior to their separation, Jonathan and Shannon lived together in New Albany, Ohio.  Jonathan subsequently moved to two different residences in Westerville, Ohio, and then in April 2021, he moved to Grove City, Ohio to live with his then-girlfriend, Alicia Zellner.  Jonathan and Alicia have a daughter together, Al.H., born in September 2021, but they separated in July 2023 and at the time of trial, Jonathan was living in Columbus, Ohio.  He also has a 14-year-old son from a previous relationship, A.H., who lives in Florida.

{¶ 5}   Shannon is a surgeon for Genesis Health Care in Zanesville, Ohio, and has been with Genesis for ten years.  (May 6, 2024 Tr. Vol. 2 at 157.)  She has lived in the same house in New Albany, Ohio for eight years. She has driven to work in Zanesville four days per week and works from home one day per week.  (May 22, 2024 Tr. Vol. 3 at 281.) She is engaged to David Ankrum, who lives in Miamisburg, Ohio, near Dayton, Ohio and resides in the West Carrollton City School District.  And although at the time of trial she still planned to commute to Zanesville for work, ultimately Shannon would like to find a job in the Dayton/Miamisburg area.  David also has three sons from a prior relationship, who were aged 12, 8, and 4 at the time of trial.  Shannon and David also have a daughter, who was born in March 2023 and who was approximately 13 months old at the start of the trial on the shared parenting modification.  All of the stepsiblings from Jonathan and Shannon's relationships have healthy relationships with each other, and Shannon has positive relationships with A.H., A.H.'s mother, and Jonathan's ex-girlfriend, Alicia Zellner.

{¶ 6}   Jonathan's alcohol consumption was a continuing issue prior to his divorce from Shannon.  At trial, Shannon testified that Jonathan's behavior was erratic when he drank, and that it "wasn't a one-time event.  This is repetitive behavior from Jon. . . ." *Id.* at 274.  When he drank during their marriage, Jonathan tended to become verbally and physically aggressive towards Shannon and threatened to harm himself on more than one

occasion. At one point he apparently blacked out and accidentally discharged a firearm in their house. (Apr. 22, 2024 Tr. Vol. 1 at 43-46.) And while Jonathan denies some of Shannon's allegations, he admits that prior to the current litigation he struggled with alcohol abuse. He had, however, tried to control his drinking without admitting he was an alcoholic and without addressing underlying issues. He was prescribed Naltrexone several years ago to help curb his consumption of alcohol—according to Jonathan, Naltrexone did not prevent him from drinking but did allow him to limit his alcohol consumption. He claimed that he was drinking much less between the conclusion of the divorce in April 2021 and July 2023 due to taking Naltrexone.

{¶ 7} Notwithstanding, the April 2021 Plan provided that Jonathan's parenting time was subject to his continued sobriety and abstinence from alcohol use. (Plan at 10.) And Jonathan was ordered to use a Soberlink device until September 30, 2022—the Plan provided that if he tested positive for alcohol or consumed alcohol that his overnight parenting time would cease immediately, and a new parenting time phase-in would begin. *Id.* But Jonathan never stopped drinking alcohol after the parties' divorce in April 2021. Instead of abstaining entirely, he apparently devised a scheme to regularly "cheat" the Soberlink device—he performed his last Soberlink screen of the day at 8:45 p.m., and then immediately consumed between three to six drinks of vodka. (Apr. 22, 2024 Tr. Vol. 1 at 61.) This routine allowed Jonathan to drink alcohol on a nightly basis but still test negative for alcohol on his first Soberlink screen the following morning. Shannon was unaware of this behavior, and Jonathan's Soberlink testing ended on September 30, 2022 as contemplated by the plan.

{¶ 8} At trial, Alicia Zeller testified that shortly after their daughter was born, Jonathan began treating her differently, becoming demeaning and dismissive. She reached out to Shannon due to the inconsistencies in his behavior, and after their conversation, she confronted Jonathan about the Soberlink requirements of the Plan. Jonathan denied a past drinking problem to Alicia. But in the fall of 2022, Alicia started seeing Jonathan's alcohol consumption as a significant problem—he was apparently consuming alcohol on a regular basis, and it caused repeated difficulties in their relationship. For example, in November 2022, Alicia and Jonathan took her two teenage daughters along with their infant daughter to the zoo. *Id.* at 95-96. Alicia indicated that Jonathan was already a bit intoxicated before

they left for the zoo, and while they were at the zoo, he kept disappearing and became visibly more intoxicated.  He was swaying, stumbling and fell into a baby stroller.  *Id*.  He became even more erratic, and on the ride home from the zoo, he grabbed Alicia's hands off the steering wheel and pulled her head away while she was driving.  *Id*. at 96-97.  When they arrived home, he crawled upstairs, punched a hole in the bedroom wall, and began crying. *Id*.  The children were scared and uncomfortable because of Jonathan's actions.  Jonathan, however, denied falling over things at the zoo, denied trying to grab the steering wheel when Alicia was driving home, and denied threatening suicide on that occasion.  *Id*. at 27-28.  In the spring of 2023, Alicia testified that Jonathan woke up and immediately began looking for their baby daughter, Al.H., as if she were lost.  *Id*. at 99.  In June 2023, Jonathan, Alicia, and Al.H. were at a wine festival, Jonathan was drinking, and he left the festival with Al.H. without telling Alicia.  *Id*. at 100.  She subsequently found him approximately a mile away, walking up a road and pushing their daughter in a stroller.  *Id*.

{¶ 9}　In July 2023, Jonathan and Alicia went on vacation to a lake with all five of their children.  But just prior to the lake vacation, Jonathan had shoulder surgery and went off Naltrexone because it would interfere with the pain medications he would be given for the surgery.  *Id*. at 30-34.  During the lake vacation, Jonathan's alcohol issues came to a head—he brought vodka on the vacation with the intent to consume the amount he normally consumed while taking Naltrexone, but he claims that because he was not taking the drug, he overconsumed and "caused a scary situation to occur."  (June 3, 2024 Tr. Vol. 4 at 487.)

{¶ 10} Jonathan drank alcohol on July 9, 2023, the first day of the lake vacation. (Apr. 22, 2024 Tr. Vol. 1 at 31.)  On July 10, 2023, Jonathan drank again and became intoxicated.  *Id*.  According to Alicia, he attempted to give C.H. a ride on an electric scooter he was using while he was intoxicated but was unable to get her on the scooter. *Id*. Jonathan also locked himself in a bedroom with R.H. and passed out—Alicia had to bang on the door and was ultimately required to pick the lock to get in.  She found R.H. "halfway under Jon pinned basically." *Id*. at 103.  Jonathan passed out in a back room, but he got up throughout the night to yell at Alicia.  *Id*. at 105.  Alicia called Shannon to advise her of the situation, and contacted Jonathan's parents to make sure they were coming to the lake the next day.

{¶ 11}  Jonathan's 14-year-old son A.H. testified that he had to check several times that night to confirm that Alicia was okay, because Jonathan was drunk, stumbling, bothering Alicia, and "acting a fool." (May 6, 2024 Tr. Vol. 2 at 215.) A.H. recorded video, and captured audio of Jonathan throwing a suitcase and saying that he would drive his truck into a wall. (*Id.* at 221; Pl.'s Ex. 10.) The following day Jonathan's parents, the paternal grandparents of C.H. and R.H., arrived at the lake. Jonathan and his father took the children out on a boat, and Jonathan testified that he began consuming alcohol after the boat outing. He denied driving the boat while intoxicated, but there was an incident during the boat outing during which R.H. felt frightened and concerned that a tow rope might get wrapped around her neck. According to Jonathan, R.H. got scared she was caught stuck between the boat and the tow rope and didn't want to move, but she was in no real danger and he jumped in the water to help her. *Id.* at 51-52.

{¶ 12}  After the boat outing, Jonathan drove to the liquor store to purchase more vodka. Jonathan admits purchasing smaller bottles of alcohol because they are easier to hide. *Id.* at 42. Jonathan also admits he consumed a large quantity of alcohol at the lake. Eventually, he became severely intoxicated and combative. Jonathan testified that he does not remember throwing things at Alicia or threatening to kill himself during the incident, but acknowledges the children were scared. Jonathan's mother testified that she told Alicia to call Shannon and take the children and leave. (June 3, 2024 Tr. Vol. 4 at 411-412.) A.H. testified that he did not feel safe, that he had to contact his mother because he wanted to leave, and that ultimately Shannon's parents took him, C.H., and R.H. to their house. (May 6, 2024 Tr. Vol. 2 at 225-226.) Alicia and Al.H. also left the house, Shannon got A.H. on a plane the next day to return to his mother in Florida, and Jonathan's parents ended up spending the night with Jonathan, although they had not previously planned to do so, "to make sure he that he was safe" because "it was apparent Jon was drunk." (June 3, 2024 Tr. Vol. 4 at 411-413.)

{¶ 13}  The next day, Jonathan drove to Alicia's house, but because he was upset Alicia left shortly after he arrived. A few hours later, Jonathan called her and told her that his supervisor was going to come pick him up from her house and take him to a rehabilitation facility. (Apr. 22, 2024 Tr. Vol. 1 at 113.) When she returned to the house, he was intoxicated and incoherent. When Jonathan's boss and co-workers arrived, they

tried putting him in the shower, but he fell and injured his face. *Id.* at 114. Alicia testified that it took them four hours to get Jonathan out of the house and into the car, and they were required to carry him because he was unable to move himself. Instead of taking him to the rehab facility, they were forced to take him to a hospital emergency room to detox because his blood alcohol content was so high. *Id.* at 115.

{¶ 14} After these events, Jonathan went through an in-patient rehab program. *Id.* at 34-35. After he left in-patient rehab in August 2023, Jonathan counseled regularly, was active in recovery groups and tested regularly on Soberlink. (June 3, 2024 Tr. Vol. 4 at 447-448.) His Soberlink tests were all negative, although he missed a few tests due to work and equipment issues. After the missed tests, he took urine tests to prove he had not been drinking. *Id.* at 498-499. Jonathan testified that after he left in-patient rehab, he followed all recommendations for his treatment but also admitted that he did not follow up with an outpatient level of care that was recommended because he did not believe his schedule would allow for that. (June 5, 2024 Tr. Vol. 5 at 562.) Regardless, the magistrate found that Jonathan has maintained his sobriety since leaving rehab in August 2023. (Aug. 13, 2024 Mag.'s Decision at 10, 21-22.)

{¶ 15} After the July 2023 incident, Shannon filed a motion for emergency custody, and an agreed interim order was filed on August 29, 2023. It addressed Jonathan's alcohol issues and treatment, modified Jonathan's parenting time, and required it to be supervised. But Jonathan did not regularly exercise the parenting time allowed by the agreed interim order, ostensibly because the supervisors required by the order were not regularly available. Jonathan did attend several of the children's extracurricular events and was able to visit with them at those events.

{¶ 16} At some point during the current litigation, Shannon raised the possibility of her moving away from New Albany. She testified that she has been looking for new employment since the summer of 2023, as she had become concerned about her current employer's financial stability. (May 22, 2024 Tr. Vol. 3 at 356.) Shannon then indicated that she was planning to move to the Dayton, Ohio area, although that relocation is only tangentially related to her employment concerns. (May 6, 2024 Tr. Vol. 2 at 171.) Instead, she filed a relocation notice with the court naming the address in Centerville where her fiancé David Ankrom's father resides. (Mar. 22, 2024 Notice of Relocation at 1.)

{¶ 17} Shannon and David became engaged in December 2023 and have a child together. (May 6, 2024 Tr. Vol. 2 at 161.) She intends to permanently relocate to a school district in the Dayton area, and believes that Springboro, Centerville, Waynesville, and Bellbrook are the best districts in that area that are close to Miamisburg, where David's other children reside. (May 22, 2024 Tr. Vol. 3 at 271.) They plan to purchase an existing house in the Dayton area, and Shannon testified that she has a strong support system in the Dayton area, including David and David's parents. (May 6, 2024 Tr. Vol. 2 at 173-174.) Shannon's own parents are also close to Dayton, and she has friends and three grown nieces in the area. Shannon believes the move to Dayton is best for her family. Shannon testified that if she does not find a house immediately in her preferred school districts, she has the option of moving in with David's father briefly in Centerville until a new home is found. Shannon will be commuting from Dayton to Zanesville four days per week for work.

{¶ 18} Jonathan currently lives about 1.5 miles from Shannon, but Jonathan's current address is approximately 90 miles from David's father's house in Centerville. Shannon estimated the drive from Dayton to New Albany is 1 hour and 20 minutes, and the drive from Dayton to Grove City, where Jonathan was living with Alicia prior to his most recent move, is a bit over an hour. *Id.* at 180-182. Jonathan believes Shannon is using the lake incident against him so she can move to Dayton, which she denies.

{¶ 19} Prior to trial, the parties reached an agreement to maintain Shared Parenting. The parties submitted a joint proposed first-amended shared parenting plan ("Amended SPP") as Joint Exhibit 1. This Amended SPP left blank certain provisions on which the parties were unable to reach an agreement, and the parties left those provisions for the magistrate to determine after trial. (Aug. 13, 2024 Mag.'s Decision at 2-12.) Following a five-day hearing on the merits, the magistrate granted Shannon's motion to modify school placement restrictions "to allow [Shannon] to enroll the children in the school district which services [her] residence," and granted her motion to modify parenting time in part, granted Jonathan's responsive motion to modify shared parenting in part, and adopted multiple specific modifications to the agreed proposed amended shared parenting plan filed by the parties prior to trial. *See id.* at 32-36.

{¶ 20} Jonathan filed objections to the magistrate's decision and a motion to set aside the decision, and on February 20, 2025, the trial court issued a 15-page decision. It

denied Jonathan's motion to set aside the decision, but it sustained Jonathan's objection to the magistrate's decision to allocate both 2024 child dependent exemptions to Shannon. The trial court overruled his objections regarding Shannon's relocation with the children, its order for Soberlink testing, and its alleged failure to account for increased travel and expenses associated with long-distance parenting time. (*See* Feb. 20, 2025 Jgmt. Entry.)

{¶ 21} Regarding the alleged relocation restrictions in the parties' 2021 Plan, the trial court observed:

> The case *sub judice* is distinguished from *Zimmer*, because here, changing circumstances, beyond relocation, led both parties to seek to modify their original shared parenting plan. . . . [I]n *Zimmer*, the term of the parties' agreed divorce decree limiting relocation was still in full effect, whereas, in the present case, the parties both seek to modify their 2021 SPP, including the terms of that Plan pertaining to relocation in regard to the school placement parent designation. Their intent is also evidenced by the fact that the parties submitted proposed shared parenting plans in advance of trial, both of which provide proposed terms for which parent should be designated the school placement parent.
>
> *For that reason, even if the parties' 2021 SPP included a term which could be construed as restricting relocation, that term no longer applied at the time of trial.* Rather, the parties in this case sought that the Court modify their Shared Parenting Plan in a way that addressed changes in circumstances since their 2021 SPP—namely, [Shannon]'s intent to relocate to the Dayton area, and [Jonathan]'s issues with alcohol use around the children since the 2021 SPP was adopted. By the time of trial, the parties had not yet agreed on new terms regarding who should be designated the school placement parent, given those changes in circumstances, and thus, litigated that issue before the Magistrate. *Given the fact that the parties both sought that the 2021 SPP be modified, and both submitted proposed shared parenting plans providing new language regarding school placement, it is clear that neither party intended to operate under the terms agreed to in their 2021 SPP and instead sought from the Court new terms reflecting their changes in circumstances since that time.* Thus, even if the 2021 SPP restricted relocation, that term no longer applied at the time of trial; therefore, *Ohio Rev. Code Ann. § 3109.051(G)(1) does apply and the Court cannot restrict [Shannon]'s right to relocate.*
>
> . . .

> Before reaching a conclusion regarding the parenting time allocation that was in the children's best interest, the Magistrate conducted an extensive analysis under Ohio Rev. Code § 3109.04(F)(1) and also considered the shared parenting factors under Ohio Rev. Code § 3109.04(F)(2); this analysis is provided on pages 13-21 of the *Magistrate's Decision.* Ultimately, the Magistrate allocated parenting time to [Shannon] that is in line with the best interest factors and the GAL's recommendations.
>
> . . .
>
> Since the *Magistrate's Decision* conducted a thorough analysis of the best interest factors, and took into consideration the GAL's recommendation, the Court **OVERRULES** [Jonathan]'s fourth objection that, "In the event that this Court does not overrule the relocation portion of the magistrate's decision, then the magistrate did not consider the best interest of the children in making his parenting time allocation."

(Emphasis in original.) (Emphasis added.) (Feb. 20, 2025 Jgmt. Entry at 5-6, 10-11.) The trial court held that the magistrate did not err by declining to order a child support deviation for Jonathan's long-distance travel expenses, holding that the analysis factors in R.C. 3119.23 "are factors that 'may' be considered by courts in determining whether to grant a deviation," but that "none of those factors 'shall' be considered," and that there is a "presumption that the statutory guideline child support amounts are appropriate . . . ." *Id.* at 13. Finally, regarding Jonathan's objection to the decision ordering Soberlink testing and setting a testing schedule, the court held:

> The *Magistrate's Decision* adopted the GAL's recommendation in part, while also taking into account Defendant's employment obligations. Upon the Court's review of the *Magistrate's Decision* regarding Defendant's obligation for completing SoberLink Testing, as well as review of the facts of this case— including Defendant's issues with alcoholism in the past, as well as his prior evasions of positive SoberLink screens despite continuing to drink daily in violation of the parties' 2021 SPP- the Court finds the *Magistrate's Decision* regarding this issue to be appropriate and in the best interests of the children.

*Id.* at 14.

{¶ 22} On appeal, Jonathan asserts three assignments of error:

> I. The trial court erred in failing to follow this court's decisions in *Ash v. Dean*, 2016-Ohio-1589, and *Zimmer v. Zimmer*, 2001-Ohio-4380.
>
> II. The trial court erred in failing to independently determine that relocation was in the best interests of the children and abused its discretion in conflating relocation with school placement parent.
>
> III. The trial court abused its discretion in failing to remand the child support order since it failed to consider Mr. Hanley's travel expenses.

All these assignments of error are reviewed for an abuse of discretion. *See generally Blakemore v. Blakemore*, 5 Ohio St.3d 217 (1983) (domestic relations matters reviewed for abuse of discretion).

{¶ 23} Jonathan's first assignment of error argues that this court's decisions in *Zimmer v. Zimmer*, 2001-Ohio-4380 (10th Dist.) and *Ash v. Dean*, 2016-Ohio-5589 (10th Dist.) compel reversal. In *Zimmer*, we held that where an approved decree of divorce included a requirement of court approval of the custodial parent's request to relocate, the trial court did not err in applying the best interest test and factors in R.C. 3109.04(F) to refuse permission for such relocation, even though R.C. 3109.051(G) does not permit a court to refuse such permission, but rather simply permits the court "to determine whether it is in the best interest of the child to revise the parenting time schedule . . . ." *Zimmer* at ¶ 18-21. In *Ash*, we concluded that the trial court erred in not considering whether "an award of custody conditioned upon [appellant's] continued residence in central Ohio" was appropriate under the circumstances, as the trial court mistakenly understood that such "conditional" custody arrangements violated the Ohio and United States Constitutions. *Ash* at ¶ 12-19.

{¶ 24} But neither *Zimmer* nor *Ash* compel reversal in this case, because the decision of the parties to submit an agreed shared parenting plan and reserve certain exceptions to the Plan for trial rendered any restrictions on relocation in the original plan and divorce decree inoperative. As the trial court observed, "in *Zimmer*, the term of the parties' agreed divorce decree limiting relocation was still in full effect," but here, "the parties submitted proposed shared parenting plans in advance of trial, both of which provide proposed terms for which parent should be designated the school placement

parent." (Feb. 20, 2025 Jgmt. Entry at 6.) It was neither legal error nor an abuse of the trial court's discretion to take the parties at their word. Indeed, even assuming that the trial court's decision was erroneous, the record suggests that Jonathan invited such error by submitting a motion to modify shared parenting, rather than requesting the court to enforce the original Plan's restrictions on relocation. *Compare, Bond v. de Rinaldis*, 2018-Ohio-930, ¶ 14 (10th Dist.) and *Nyamusevya v. Nkurunziza*, 2011-Ohio-2614, ¶ 21 (10th Dist.) ("[F]or appellant to complain on appeal that the trial court erred by ordering what he and appellee requested appears in contravention of the invited error doctrine which provides that a party may not take advantage of an error which he himself invites or induces the trial court to make.").

{¶ 25} We have little doubt that Jonathan's attempt to modify shared parenting was a strategic choice. Considering his long history of alcohol abuse and evidence suggesting that he placed the children in jeopardy on multiple occasions, it was unlikely that any court would have granted him custody of the children if shared parenting were terminated, thereby causing him to lose any right to object to Shannon's decision to relocate. He sought to retain shared parenting and his rights thereunder, but also to require that the children remain in their current school district, no matter what. The trial court did not abuse its discretion in rejecting this outcome, and accordingly Jonathan's first assignment of error lacks merit and is overruled.

{¶ 26} Jonathan's second assignment of error also lacks merit. Jonathan argues that the magistrate and trial court failed to engage in a separate best interest analysis prior to permitting relocation of the children. We are not persuaded. Pursuant to R.C. 3109.04(E)(2)(a), once the parties submitted their joint agreed shared parenting plan and limited the issues presented for trial, the agreed-upon modifications became presumptively valid unless the court found they were *not* in the children's best interest, and the remaining contested provisions of the Plan, including modifications regarding parental relocation, were properly left to the court to craft and determine under R.C. 3109.04(E)(2)(b), so long as it determined those *modifications* were in the best interest of the children. The court did not err "by conflating relocation with school placement" or by "failing to independently determine that relocation was in the best interests of the children," because there is no statutory requirement that it must engage in two separate best interest analyses—one for

modification of the Plan and one for relocation of the children under the Plan. Moreover, we are unconvinced that there is, or even that there could be, a difference between such analyses; in this case, the distinction Jonathan purports to identify is largely semantic.

{¶ 27} In any event, we must observe that Jonathan did not object to any of the magistrate's extensive findings of fact, (*see* Aug. 13, 2024 Mag.'s Decision at 1-26), and he has identified no specific evidence that allowing Shannon to relocate to the Dayton area weighed against the children's best interest, other than the fact that he might well see them less frequently. Rather, his primary objection is one of timing, that Shannon is using his alcohol abuse as a pretext to move in with her fiancé, but he offers only his conjecture that this is the case. But in support of Shannon's request for relocation and modification of the Plan, the magistrate observed that "Shannon testified that she has a strong support system in the Dayton area" including David, David's parents, Shannon's own parents, and her friends and three grown nieces in the Dayton area. *Id.* at 11. Shannon testified without contravention that "she could use family assistance in this case, especially for circumstances like what occurred in July 2023 when she had to adjust her surgery schedule after the lake incident . . . . [and that] the move to Dayton is best for her family." *Id.* And ultimately, the trial court correctly observed that "the Magistrate conducted an extensive analysis under Ohio Rev. Code § 3109.04(F)(1) . . . considered the shared parenting factors under Ohio Rev. Code § 3109.04(F)(2) . . . conducted a thorough analysis of the best interest factors, and took into consideration the GAL's recommendation . . . ." (Jgmt. Entry at 11.) The trial court did not abuse its discretion by adopting the magistrate's view of the facts on these issues, and Jonathan's second assignment of error is accordingly overruled.

{¶ 28} Finally, Jonathan's third assignment of error asserts that the trial court erred by not sustaining his objection to the magistrate's failure to deviate from the child support guidelines because he would be required to travel to see his children. But as the trial court observed, such a deviation was not mandated by statute. *Id.* at 11. And we agree with the trial court that Jonathan "failed to present sufficient evidence to rebut the presumption that the statutory guideline amounts for his child support and cash medical support obligations are appropriate in this case." *Id.* at 13. Shannon gave ample notice to the court of her intent to move to the Dayton area prior to trial, but Jonathan wholly failed to present any evidence to support a deviation based on travel distance—he did not submit a budget, provide a

summary of expected travel costs, or offer any documentation of additional anticipated child-related expenses. The trial court did not err by adopting the magistrate's recommendation on this issue, because there is nothing but speculation in the record to support his claim. We accordingly overrule Jonathan's third assignment of error.

{¶ 29} For all the foregoing reasons, Jonathan's three assignments of error are overruled. The judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations is affirmed.

*Judgment affirmed.*

MENTEL and EDELSTEIN, JJ., concur.

————————————